RICHARD H. AND ROBERTA F. KAEHN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaehn v. Commissioner
Docket No. 45398-85.
United States Tax Court
T.C. Memo 1987-608; 1987 Tax Ct. Memo LEXIS 653; 54 T.C.M. (CCH) 1293; T.C.M. (RIA) 87608; December 14, 1987; As amended December 10, 1987 Ernest J. Choquette, R. John MacKoul, Jr., Daniel B. Huyett, and Charles F. Blumenstock, Jr., for the petitioners. James C. Fee, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficinecies in petitioners' Federal income tax: Year
Deficiency
1980
$ 12,158.15
1981
12,863.46
Because of concessions by petitioners, [1] the sole issue for decision is whether petitioners' farming activity constituted a trade or business or an "activity not engaged in for profit" within the meaning of section 183(a). [2]
FINDINGS OF FACT Some *656 of the facts have been stipulated and are found accordingly. This reference incorporates the stipulation of facts and the attached exhibits. Petitioners are husband and wife and resided at Kempton, Pennsylvania at the time they filed their petition. Their Federal income tax returns for calendar years 1980 and 1981 were prepared using the cash receipts and disbursements method and filed with the District Director of Internal Revenue, Philadelphia, Pennsylvania. Petitioners have five children. In 1980, three of the children lived with petitioners. In 1981, two of the children lived with petitioners. Richard Kaehn was employed as a cargo pilot be Seaboard World Airline and its successor, Flying Tiger Airline, from 1956 to 1983. His embarkation point was New York City. Mr. Kaehn retired from his piloting job in January 1983. During the late 1960s, petitioners decided to purchase a farm. At that time, Mr. Kaehn was earning about $ 20,000 per year. Petitioners hoped that income from the farm would supplement Mr. Kaehn's current income, and provide income after Mr. Kaehn's retirement, which, under Federal Aviation Administration regulations, would occur when he reached *657 the age of 60. Petitioners' decision to purchase a farm was not motivated by tax considerations. Between 1968 and 1970, petitioners looked at more than two dozen farms. Their primary criteria for choosing a farm were location and price. The property had to be within three hours of the airport where Mr. Kaehn began his flights. Because the cost of land was too high in New Jersey, petitioners began looking in Pennsylvania. Petitioners sold their home in Delaware County, Pennsylvania to provide funds for the down payment on the farm. Petitioners purchased their farm in 1970 for $ 68,000. At the time they purchased it, it had been in the soil bank conservation program for approximately 5 years. Thus, there were no productivity records from the prior owner for petitioners to review. Petitioners did not have a feasibility study performed to determine if it could be farmed profitably. Of the farm's 174 acres, 100 are suitable for crops, 30 for pasture, and 33 for woodland. the farm is hilly. Most of the soil is shale soil that is susceptible to drought because of its inability to hold water. A farm of this size with this type of soil should support between 30 and 40 1,000 *658 pound cattle. At the time petitioners purchased the farm, its improvements included a 2-1/2 story dwelling, a two-story barn, a three-car garage, a chicken house and a butcher shop. Mr. Kaehn has since built a corn crib. The property has been petitioners' primary residence since 1970. Its condition is not such that it would be considered a country estate. There are no recreational facilities, such as tennis courts or a swimming pool. It does, however, have a pond, and petitioners have kept horses. After they purchased the farm petitioners began a cattle breeding operation. A cattle breeder generates income by selling bulls to other farmers. Petitioners chose a breeding operation because the farm's terrain and soil were not suitable for raising crops for commercial sale and petitioners believed that a dairy operation would be too time consuming. Petitioners promoted their operation by showing their animals and hoped that, by winning award, they would develop a favorable reputation for their herd and thereby increase the value of it. Petitioners' children joined the 4-H program to learn about showing cattle and thereby help petitioners in this effort. Petitioners did not *659 advertise their operation. Petitioners began with 11 cows and 1 steer. Mr. Kaehn borrowed a bull, which he later purchased, for breeding. The herd has been as large as 25 animals, at the beginning of 1978, and as small as 7, at the beginning of 1983. At the the beginning of 1980, the herd had 23 animals -- 12 cows, 10 steers and 1 bull. At the beginning of 1981, the herd had 16 animals -- 13 cows, 2 heifers and 1 bull -- and at the end of 1981, it had 17 animals -- 13 cows, 3 heifers and 1 bull. Before Mr. Kaehn retired, he was unable to devote his full time to the farm. His airline employment required between 60 and 70 hours of flying per month. When he was not flying, however, he devoted his time to the farm, and he spend his vacations working on the farm. When Mr. Kaehn was not home, Mrs. Kaehn and their children performed the farm chores. While working on the farm on different occasions, Mr. Kaehn severed a finger and suffered a severe cut on his leg. Petitioners hired no outside labor. Petitioners encountered several difficulties in their breeding operation, including both calf and cattle disease and nutrition problems. Partly because of these problems, petitioners *660 changed to a commercial beef operation in 1975. A commercial beef operation sells steers for human consumption. Since changing to the commercial operation, petitioners have suffered additional difficulties, including the accidental poisoning of two cows in 1978. In 1978, petitioners valued some of their cattle at $ 250 perhead, and the remainder of their cattle at approximately $ 400 per head. As part of both the breeding and commercial operations, petitioners have raised crops for animal feed. Generally, petitioners sell any excess feed, but they have also used it to raise pigs. During 1980, petitioners' crops were harmed by drought. Neither Mr. Kaehn nor Mrs. Kaehn was raised on or had lived on a farm before purchasing their property. Mr. Kaehn was able, however, to discuss farming with his brother-in-law and his brother-in-law's father who were raised on farms, and fellow pilots who either were raised on or owned farms. During the course of operating the farm, petitioners consulted other farmers, the county agricultural agent, [3] and the Agricultural Soil Conservation Service (ASCA). Mr. Kaehn also attended meetings organized by the county agent and read numerous publications *661 in an effort to educate himself about farming. In 1971, petitioners requested an employee of the ASCS to survey the farm and lay out fields. A report dated May 5, 1975 was furnished to petitioners pursuant to this request. In 1975, Mr. Kaehn received advice from the county agent regarding no-till planting, a method of planting in which the field is not plowed, which he later adopted. Petitioners did not maintain a separate checking account for the farm. At the end of each year, Mr. Kaehn entered the farm expenses, which he determined from cancelled checks and receipts for cash expenditures, in a cash disbursements journal. Petitioners maintained no other accounting records. Mr. Kaehn maintained detailed field records that dealt with, among other things, planting, fertilizing and liming, but not with crop yield. Petitioners did not maintain separate records of their cattle. The following chart reflects the results of petitioners' farming operations for the years 1970 to 1985: Livestock (a)
Grain
Other
Total
Year
Sales
Sales
Income
Income
Depreciation
1970 (b)
$    - $   -  $    - -0- $    383
1971 (b)
- -  - 1,262
2,491
1972
76
-0- 1,146
1,222
2,652
1973
455
1,059
614
2,127
2,829
1974
1,235
1,030
104
2,370
2,939
1975
1,274
641
178
2,093
3,336
1976
-0-
2,084
109
2,194
4,483
1977
-0-
2,020
429
2,448
5,095
1978
2,319
1,134
2,101
5,555
5,484
1979
962
1,381
283
2,625
5,825
1980
-0-
1,896
1,134
3,030
6,702
1981
2,419
-0- 113
2,533
8,075
1982
-0-
161
172
333
11,265
1983
3,326
2,609
758
6,692
13,816
1984
861
-0- 759
1,620
13,204
1985
2,296
-0- 668
2,964
10,362
*662 Taxes and
Other
Total
Year
Interest
Expenses (c)
Expenses
Loss
1970 (b)
$   -  $     - $ 1,515
$ ( 1,515)
1971 (b)
-  - 7,098
( 5,836)
1972
-0- 6,606
9,258
( 8,036)
1973
1,687
6,778
11,293
( 9,166)
1974
2,015
7,829
12,783
(10,414)
1975
3,681
7,746
14,763
(12,670)
1976
3,792
8,994
17,272
(15,078)
1977
5,564
9,303
19,963
(17,515)
1978
5,884
11,485
22,853
(17,299)
1979
5,962
11,124
22,911
(20,286)
1980
7,505
15,957
30,164
(27,133)
1981
6,706
12,991
27,773
(25,240)
1982
8,243
9,947
29,454
(29,121)
1983
8,057
14,351
36,224
(29,532)
1984
6,331
10,906
30,441
(28,821)
1985
7,016
14,228
31,606
(28,642)
All figures are rounded to the nearest dollar. Minor discrepancies in totals are due to rounding.
(a) Livestock sales are shown net of cost of livestock sold. They include hog sales of $ 455 in 1973, $ 607 in 1975 and $ 1,227 in 1978.
(b) Only Total Income and Total Expenses are in the record for 1970 and 1971. Depreciation figures were reconstructed from later years' depreciation schedules.
(c) Includes feed purchases of $ 146 in 1978, $ 159 in 1979, *663 $ 178 in 1980, $ 152 in 1981 and $ 408 in 1982. Mr. Kaehn had income representing pilot's wages as follows: [4]
Year
Pilot Wages
1972
$  48,211.42
1973
31,820.28
1974
32,950.09
1975
46,200.98
1976
55,793.85
1977
50,870.80
1978
57,337.63
1979
84,092.76
1980
86,511.25
1981
113,963.40
1982
142,311.70
1983
39,753.98
Petitioners purchased personal property that would entitle them to investment tax credits of $ 428.00 in 1980 and $ 1,020.43 in 1981 if it is determined that the farm was operated for profit during those years. ULTIMATE FINDING OF FACT Petitioners' farming activity was an activity not engaged in for profit during the years in issue. OPINION The sole issue for decision is whether petitioners' farming activity in 1980 and 1981 was an "activity not engaged in for profit" under section 183(a). [5] Whether an activity is engaged in for profit depends on whether the taxpayer has a bona *664 fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioners' objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979). The burden of proof is on petitioners. Golanty v. Commissioner, supra at 426; Rule 142(a). *665 The regulations under section 183 list nine factors that normally should be considered in determining whether an activity is engaged in for profit. These are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. Section 1.183-2(b), Income Tax Regs. These factors, however, are not intended to be the exclusive factors in making the determination. Golanty v. Commissioner, supra at 426. We see no need to discuss each of the foregoing factors separately. Rather, we will deal with the entire record in the context of the parties' arguments. Petitioners contend that they own a working farm from which they do not derive personal pleasure, *666 not a rich person's country estate. They also contend that several of the factors in the regulations show that they operated that farm with a profit objective, including the substantial amounts of time expended in operating it, the knowledgeable individuals and the government agencies from whom they sought advice, and the external factors by which they explain their losses, specifically disease, nutrition problems, accidents and weather. Finally, petitioners contend that the losses that they have suffered could not be sustained by individuals in their economic position without an ultimate profit objective, and that at least part of the profit will be from the increased value of their land. Respondent, on the other hand, contends that petitioners' manner of operating the farm and long history of losses, taken in conjunction with other elements included in the nine factors set forth in his regulations, belie any potential profit objective. Respondent also contends that any increase in the value of the land is irrelevant in determining whether there is a profit objective to the farming activity. Petitioners testified that they purchased and operated the farm with the intent to *667 make a profit. In particular, they testified that they hoped to have an additional source of income because of fluctuation in Mr. Kaehn's flying income and as a supplement to his retirement income. While we found petitioners to be believable witnesses, such statements of subjective intent must be tested in the light of all the facts and circumstances, and are to be given less weight than other, objective facts to which we now turn. Engdahl v. Commissioner,72 T.C. 659, 667 (1979); Churchman v. Commissioner,68 T.C. 696, 701 (1977). We agree with petitioners that they own and operate what appears to be a working farm and that Mr. Kaehn and his family worked hard and long. [6] The condition of the property's improvements, as shown by the photographs introduced into evidence, and the property's lack of recreational amenities such as tennis courts and swimming pools, lead us to the conclusion that it is not a country estate. In addition, it is clear that petitioners derived little personal pleasure or recreation in the usual sense from their farming activity. The time expended by petitioners, as well as Mr. Kaehn's injured hand, is evidence of this. *668 The same is true of petitioners' children. While petitioners at one time kept horses and the children went swimming in the pond, petitioners' intent in purchasing the farm was not to provide recreation for their children. [7] In any event, these activities took place before the years in issue here and were never more than incidental to the farming activity. We note that only two of the children lived on the farm in 1980. Petitioners did seek advice on farming in general and the specific problems that they encountered. Some of the advice, in particular that of Mr. Kaehn's *669 fellow pilots and petitioners' relatives, related only to the start-up stages of the business. Much of the advice about continuing operations and specific problems was sought in a haphazard manner, especially that of the loan officer and the county agent. While we do not doubt that that advice was valuable, it was given on an ad hoc basis, and much was not designed to improve the overall operation of the farm or to make the operation profitable. Petitioners also received advice on farming methods, e.g., the ASCS field survey and the description of the no-till method from the county agent. While these recommendations also were valuable, and we think petitioners implemented the, neither dealt specifically with the problems of a commercial beef or cattle breeding operation, and neither was likely to develop the short-term profitability of the farm. [8]
We also find petitioners' manner of conducting the business aspects of the farm inconclusive. Their financial records, prepared only once a year, were marginally adequate. *670 The only records of the physical operations were the field records, dealing with crops being raised for feed. While petitioners were starting up their cattle breeding operation, no records were maintained of the animals' characteristics or bloodlines. Later, when petitioners changed to a commercial beef operation, no records of the cattle in their herd were maintained. We are left with a string of losses running, uninterrupted, from 1970 to 1985. We recognize that the combination of significant outside income and continuous losses that exists herein is not sufficient, in and of itself, to defeat a claim of profit objective. Both, however, are factors to be considered, section 1.183-2(b)(6) and (8), Income Tax Regs., and a record of substantial losses is an "important factor." Golanty v. Commissioner,72 T.C. at 426. In the face of such a sustained period of losses, we think it was incumbent on petitioners to produce some evidence which would indicate that their farming activity shoed a prospect for profitability in the future; this they have not done. [9] Petitioners attempt to explain their losses in several ways. Some are the normal start-up losses of a business. *671 But, we think a start-up period cannot be stretched to cover 15 years. Petitioners blame some of the losses on disease and nutrition problems. These problems, which occurred during the early 1970s, were largely caused by petitioners' inexperience, and seem to have led to the change from cattle breeding to a commercial beef operation. Here again, such losses occurred during what could reasonably be considered the start-up period and long before the taxable years involved herein. Petitioners point to two other events that they claim contributed to their later losses. The first was the accidental death of two cows in 1978. Petitioner valued these animals at either $ 250 or $ 400 each on a 1978 loan application. We think that the loss of at most $ 800 in a year where the farm operation lost over $ 17,000 is relatively minor. [10] Second, petitioners point to the "devastating" 1980 drought, the effects of which, they claim, carried over to 1981, when they were *672 forced to purchase feed because of it. The 1981 feed purchases of $ 152, however, are not out of line with purchases of $ 146, $ 159 and $ 178 in the preceding 3 years. [11]
We believe that petitioners' losses were due to the fact that the size of their herd, and the resulting volume of sales, was not sufficiently large to support a profitable operation. A 1970 appraisal of the farm indicated that 50 head of purchased cattle would be necessary to break even. It is clear from petitioners' record of losses that a herd of between 15 and 25 is not sufficient. See pp. 4-5 supra. Indeed, Mr. Kaehn's testimony indicates that even he did not think that, at least before 1984, the herd size was sufficient to operate the farm in a profitable manner. Mr. Kaehn also testified that the most profitable use for his crops was as feed for his cattle. Yet every year from 1973 to 1983, except 1981, petitioners were able to sell surplus feed. [12] In several years, petitioners' *673 feed sales were greater than their cattle sales. Petitioners make much of their 1980 attempt to purchase additional land in order to grow crops for their cattle. Given the fact that they already grew feed in excess of the needs of their cattle, we fail to understand how the acquisition of more land to add to that excess indicates a profit objective, even assuming that petitioners would have had the time and equipment to farm the additional land. Petitioners argue that their financial status was such that they could not have carried on their farming activity without regard to profit. While petitioners' status may have fit that description in 1970 when they purchased the farm, their financial condition had improved significantly by 1980 due to the increase in Mr. Kaehn's income. We turn now to petitioners' final contention -- that the potential increase in the value of the property was sufficient to give them a profit objective. Under the regulations, expected increase in the value of the assets used in the activity is a factor to be considered in determining profit objective. Mr. Kaehn *674 testified that, in his opinion, the value of the property was $ 250,000, and petitioners placed a value of $ 175,000 and $ 250,000 on the property when applying for loans in 1980 and 1981. No other appraisals pertaining to 1980 or 1981 were introduced. [13] We think that petitioners expected the property to increase in value but such an unsupported expectation is not sufficient to support a profit objective. Moreover, between 1970 and 1984, petitioners made no effort to determine whether that expectancy was bearing fruit. [14] Finally, even if such an expectation existed, we are not satisfied that it should be considered a significant element in this case, where petitioners acquired the farm to live and work on -- an objective obviously inconsistent with the ultimate sale of the property at a profit. [15]
*675 In sum, although we found petitioners to be forthright, our evaluation of the entire record herein leaves us unpersuaded that they have carried their burden of proof. Even if we accept petitioners' assertion that tax considerations did not significantly influence their farming activity, this element in and of itself would not require us to render a decision in their favor. [16] We believe that petitioners' farming activities, while not carried on for purposes of recreation and pleasure, were conducted with the objective of providing petitioners with a place for them and their children to live and for Mr. Kaehn to keep himself fruitfully occupied (originally during his spare time and full-time after retirement), hopefully on a break-even basis, at least to the extent of the excess over taxes and interest which would be items of expense in connection with any residence owned by petitioners. [17] Accordingly, we hold that petitioners have failed to prove that they had the requisite profit objective during the taxable years at issue. [18]
*676 Our holding also determines the issue of the investment tax credit. Section 38 allows a tax credit on investments in section 38 property as defined in section 48(a). Under section 48(a), section 38 property is, in general, personal property that is recovery property under section 168 or for which depreciation is otherwise allowable under section 167(a). Because the farming operation is not a trade or business, depreciation is not allowable under section 167(a) or section 168. The assets used in the farming operation are therefore not section 38 property within the meaning of section 48(a) and no investment tax credit is allowable. Petitioners having conceded other issues involved in the notice of deficiency, Decision will be entered for respondent.
Footnotes
1. Petitioners conceded on brief that respondent's disallowance of deductions for Mr. Kaehn's commuting expense was correct. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. The county agent is an employee of the cooperative extension program of the Pennsylvania State University. ↩
4. Petitioners had small amounts of other income from dividends, etc. In 1983, Mr. Kaehn received approximately $ 65,500 in taxable pensions and had taxable pension receipts of approximately $ 42,000 in each of the years 1984 and 1985. ↩
5. Section 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) allows those deductions that would be allowable without regard to whether the activity were engaged in for profit. Section 183(b)(2) allows additional deductions that would be allowable by reason of paragraph (1)." Section 183(c) defines "activity not engaged in for profit" as an "activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (20 of section 212." ↩
6. We recognize that Mr. Kaehn worked only part time. But it is clear that, when he was home, he worked long hours and that his wife and children sought to perform the necessary chores during the time he was absent because of his job. Petitioners' employed no outside labor. Under all the circumstances, we do not find Mr. Kaehn's part-time attention to his farm activity a significant negative factor. See sec. 1.183-2(b)(3), Income Tax Regs.↩
7. We note in this regard that the 4-H programs that petitioners' children participated in were as much to benefit the farm as to provide recreation for the children. ↩
8. Both the ASCS field layout and the no-till planting method are designed to contol erosion, which will help maintain the long-term quality of the land. ↩
9. Compare Boddy v. Commissioner,T.C. Memo. 1984-156, affd. without published opinion 756 F.2d 884 (11th Cir. 1985), with Fields v. Commissioner,T.C. Memo. 1981-559↩. 10. See Boddy v. Commissioner, supra.↩
11. The dramatic increase in the 1980 loss over the 1979 loss is largely explained by increased interest payments and increased gasoline and fuel expenses. ↩
12. In several years in the 1970s, petitioners also used surplus feed to raise pigs. ↩
13. An appraisal, dated February 28, 1984, made by connection with a loan application indicated a value of $ 255,000, as did a similar appraisal, dated February 25, 1987. ↩
14. See LaMusga v. Commissioner,T.C. Memo. 1982-742↩. 15. There is not the slightest indication in the record that income to be derived from any disposition of the property at an appreciated value was considered as a substitute for the hoped-for farm profit. ↩
16. We note that, while it is reasonably clear that tax considerations were not involved in the original acquisition, it is not as clear that such considerations had not become significant by 1980. ↩
17. That the break-even situation failed to develop and the petitioners actually suffered out-of-pocket losses during the taxable years at issue does not, under the circumstances herein, operate to change our view. We note that respondent has allowed deductions for interest and taxes in excess of the income derived from the farming activity. See note 5, supra.↩
18. Even if we were to conclude that petitioners had that objective when they acquired the farm in 1970, it would not necessarily follow that that objective carried over to a period 10 to 11 years later. See sec. 1.183-2(a), Income Tax Regs.↩ By the same token, the absence of that objective, during the taxable years at issue, is not determinative of the situation in later years because of a changed pattern of farming after Mr. Kaehn actually retired and presumably devoted full-time to his farm activities although we are constrained to note that the level of substantial losses apparently continued through 1985.